FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 18 2015

JEFFREY P. COLWELL
CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01146-KLM

DAVIS T. STEPHENSON,
Petitioner

v.

PAUL GRAY, Colorado Division of Adult Parole; and
CYNTHIA COFFMAN, Colorado Attorney General,
Respondents

---

## REPLY TO RESPONDENTS' ANSWER

---

Petitioner replies here to Respondents' Answer filed on December 2, 2015, in accordance with the Court's September 25, 2015, Order.

**Claim 1**

I.   Respondent states in his Answer that the defendant in a criminal proceeding must be "actually prejudiced by the error." Here, Applicant is not arguing that a mere error was committed, but that the statute used to prosecute him was a violation of the First Amendment of the U.S. Constitution. The principle of free speech has no validity if states can arbitrarily pass laws violating it, selectively apply those laws to silence critical voices—thus neutralizing political speech, as occurred in Applicant's case— and the state's Attorney General can engineer dismissal of challenges to the unconstitutional law by employing semantical arguments. Because Colorado's criminal libel statute was decriminalized in 2012 by the State Legislature, the Applicant is the only remaining party with legal standing to challenge its constitutionality. While other states' criminal libel statutes have been declared unconstitutional in federal proceedings, this Colorado petition is a matter of first impression for the federal court, and is the Court's last chance to examine the law's constitutionality. Applicant argues that states have no authority to prosecute

1

defendants using flagrantly unconstitutional laws regardless of the parameters of the prosecution or alleged crimes. Laws in any state must conform to the U.S. Constitution; this is especially true with regard to the written word.

II.      Colorado's criminal libel statute, Section 18-13-105, CRS, criminalizes truth, in overt violation of the First Amendment and precedent case law, notwithstanding Respondent's claims.  The final two sections of the statute read as follows:

> (2) It shall be an affirmative defense that the publication was true, *except* libels tending to blacken the memory of the dead and libels tending to expose the natural defects of the living.
>
> (3) Criminal libel is a class 6 felony.

This is the law under which Applicant was prosecuted. According to this law, if someone was an amputee and one published an observation of this disability, he would be guilty of a felony. If someone with a checkered background died, and one published a detailed obituary about his life, the writer would have committed a felony. Respondent claims that "truth is always a defense to libel," but this is inaccurate. In Applicant's case, criminal libel charges were filed in relation to a letter that the police knew was true prior to the filing of the charges. Applicant was assaulted in court during a civil proceeding by a witness, Marilyn Wood, who also stated that she feared Applicant due to his American Indian ethnicity. Applicant later wrote a letter to an alcohol treatment center at which Wood volunteered detailing this assault, for which Wood had been convicted; the letter was provably true (attachment 1), yet Applicant was later charged with criminal libel for writing the letter (attachment 2). This charge was later dismissed by the prosecution on technical grounds, but it demonstrates that truth was not a defense to criminal libel in Applicant's case.

**III.** Respondent cites case law stating that a statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," yet Colorado's criminal libel statute did precisely that. It was sweepingly overbroad and selectively enforced. There have been myriad cases very similar to the Applicant's in recent Colorado history, yet most have not been the subject of criminal charges, certainly not criminal libel or other felonies. This fact defines arbitrary and discriminatory enforcement. Moreover, Respondent argues that federal courts must defer to states' highest courts with regard to interpretation of statutes, yet this argument fails if the state's high court endorses violation of the U.S. Constitution. And the argument that an explicit reference to parody is unnecessary misses the larger point, because the phrasing of the statute prohibited *any* type of speech—parody, fiction, non-fiction, journalism, advertising—that exposed the natural defects of the living or blackened the memory of the dead. While the Applicant should never have been prosecuted for satire and parody of public figures, the more salient point is that the statute should never have existed in the first place. Respondent claims that the Colorado Supreme Court construed the statute "in a constitutional manner" in its last review, but this is inaccurate. The libel statute, as written, still criminalized truth and was left open to selective enforcement by vindictive prosecutors and police officers willing to utilize it as a weapon in order to silence oppositional political speech.

**IV.** According to the United States Supreme Court, public figures can't be libeled, as Respondent observes; this is especially true where satire—defined as "public ridicule in order to raise social awareness"—is concerned. Not only did Colorado's statute neglect to make an exception for public figures, but the subjects of Applicant's texts—college professors, correctional officers, the police—are public figures, according to

the *Associated Press Briefing on Media Law* (attachment 3). Indeed, even the trial judge conceded that some were limited-purpose public figures, but still allowed the prosecution to continue, such was his indignation that someone would ridicule his associates within a small town's establishment. Other subjects were a student editor-in-chief of a college newspaper and the actors in and producers of *The Vagina Monologues* play; these people were no longer private individuals because they had knowingly inserted themselves into public discourse. Respondent observes that the Colorado Supreme Court had ruled that the libel statute was "valid to the extent it penalizes libelous attacks ... where one private person has disparaged the reputation of another private individual," regardless if the "libelous attack" was intended to be humorous or satiric, which led to abuses of the law in instances where elites within the community were ridiculed, as in the Applicant's case and Thomas Mink's *Howling Pig* case. Furthermore, regardless of the Colorado Supreme Court's interpretation, the locution of the statute was not changed and still had the effect of potentially criminalizing even truthful statements, as in the Applicant's letter regarding Marilyn Wood.

V.     Durango Police Detective Rita Warfield became obsessed with the Applicant's writing at the inception of her investigation; the criminal libel statute provided a vehicle for her to act on this obsession. In her police reports, she mentions the Applicant's writing myriad times and takes obvious umbrage at his political criticisms of the police and feminist academics (examples: attachments 4, 5, and 6). In attachment 5, she cites "newsletter type flyers with articles slandering some FLC professors," a reference to the *Fort Lewis Men's Jester*, a humorous text with "jester" in the title and clearly labeled "acerbic satire" (attachment 7). The *Jester* was entered as evidence in Applicant's case, marked as a prosecution exhibit, and shown to the jury as evidence of criminal behavior, along with other examples of Applicant's writing

4

that Warfield found personally offensive or inappropriate (attachments 8-14), including a legal letter to the Colorado ACLU found in Applicant's apartment regarding one of her retaliatory search warrants. Apparently, even an attempt by the Applicant to *request protection* from Warfield's antipathy and civil rights violations constitutes a crime in her eyes. Warfield on other occasions of which the Court is aware reported Applicant to the FBI as a "domestic radical and terrorist" in response to a column he wrote that merely mentions the American Indian Movement and served overtly retaliatory search warrants to punish Applicant for criticizing the police (see attachments to Applicant's initial Petition for Writ of Habeas Corpus). These exhibits and actions and Warfield's propensity to include all forms of writing she personally disapproved of as evidence of ostensible criminal behavior buttresses Applicant's First Amendment claims and demonstrate that he was the victim of an anti-free speech campaign that included the arbitrary use of an unconstitutional law.

VI.  Respondent argues that Applicant was not prejudiced because libel was but one of a litany of charges, and removing it would leave the other felonies for which Applicant was convicted, but the sheer number of counts surely influenced the jury, established the tenor of the trial, and impacted plea negotiations by giving the state more leverage to demand a harsher sentence. Had this unconstitutional statute not been used, the outcome of both the trial and plea negotiations would have been different.

## Claim 3

I.  Notwithstanding her claims of twenty years of experience, attorney Rae Dreves-Randolph was wholly unprepared and demonstrated abject ineptitude and unfamiliarity with Colorado law during the course of Applicant's trial, predicated mainly on her lack of preparation time. Applicant argues here that because Colorado law bars ineffectiveness claims from being addressed on direct appeal that his claim is not procedurally barred. This prohibition potentially denies a defendant his

5

constitutional right to effective counsel and cannot withstand judicial scrutiny. While Applicant withdrew further ineffective assistance of counsel claims at the state level when he agreed to a sentence reduction in exchange for his settlement of his Crim.P.35(c) postconviction motion, this is not a legitimate waiver and "makes compliance with the state's procedural rules impracticable," as the Court noted in its September 25, 2015, Order. In the Applicant's case, it was impossible to comply with this requirement. He was prevented from presenting his ineffectiveness claims on direct appeal, not only by the state's rules, but because the very attorney who had been so incompetent at trial coerced Applicant into allowing her to represent him in his direct appeal, where she refused to supplement the record with requisite motions and trial transcripts, giving the Court of Appeals no choice but to defer to the lower court's ruling and affirm the conviction. Dreves-Randolph was later the subject of a complaint for incompetent representation by the Colorado Supreme Court Office of Attorney Regulation due to this malfeasance and ineptitude (attachment 15); she was found guilty and suffered sanctions as a result (attachment 16). Dreves-Randolph's inability to provide competent representation by refusing to supplement the record was perpetrated despite instructions to ensure that the transcripts were included from both the Applicant and another attorney who was doing research for her (attachment 17). A requirement that a prisoner—who has been sentenced to 23 years in prison for lampooning and ridiculing with written texts—withdraw an ineffective assistance of counsel claim in exchange for release has no validity; it is coercive, and is tantamount to holding a gun to Applicant's head. This is a clear example of interference by state officials and deprives Applicant of his constitutional rights.

II.   Respondent asserts that Applicant's claim "fails to sufficiently state facts to support his claim." Applicant's Petition for Writ of Habeas Corpus was filed pro se and he relied on a book for instruction, which states that the "claim should be very brief …

you should not make extensive legal arguments anywhere in the petition." Applicant is not an attorney, and it is ironic that the state is using against him the fact that he was forced to rely on an instructional book to file his claim to attempt to deny him access to the Federal Court. In the instant motion, Applicant, in response to the Respondent's claims, includes the facts that support claim 3.

III.    Contrary to Respondent's claims, attorney Rae Dreves-Randolph did not have two and a half months to prepare for trial. In her Motion for Continuance of Trial (attachment 19), dated November 17, 2005, Dreves-Randolph observes that Applicant's previous attorney Eric Sanford's Motion to Withdraw had only been granted one day before, on November 16, and that Sanford had not done any preparation or investigation. At this point, Dreves-Randolph was only licensed *pro hoc vice*, and there were subsequent licensing difficulties regarding her status and ability to practice law in Colorado. To the best of Applicant's recollection, these difficulties were resolved in early December 2005, approximately one and a half months before the trial, with the holidays intervening. Dreves-Randolph observes in the Motion for Continuance of Trial that "actual prejudice will occur in the event he is required to go to trial ... on January 17, 2006," that there are "72 potential witnesses to be interviewed in preparation of this case," and that it is "a voluminous file of Constitutional proportions" rife with "complex Constitutional issues." At a hearing regarding her possible appointment prior to the filing of this motion, she had protested to the Court that the case was simply "too voluminous" for her to prepare in such a short time if she were in fact appointed. Applicant repeatedly expressed concerns regarding her lack of preparation and importuned her to raise these issues on appeal (attachment 20). Dreves-Randolph assured Applicant she would include these issues in the appellate briefs, but ultimately did not.

**IV.**   Respondent states that Applicant "failed to even allege" what information would have been revealed had Applicant's attorney performed cross-examinations. This is factually incorrect; Applicant's Crim.P.35(c) contained detailed information regarding two witnesses, Amanda Kershner and Rita Warfield.

**A.**   Kershner, at the time of Applicant's trial, had an outstanding arrest warrant for a massive eleven-count check fraud scheme (attachments 21 and 22). She was located hiding in Kansas and given immunity for these charges in exchange for her testimony against Applicant. Respondent notes the jury was made aware that Kershner was given "immunity from any warrants ... pending here," but the jury was given the impression that immunity was granted for warrants relating to her role in the Applicant's case, where Dreves-Randolph should have ensured that the jury knew Kershner had been involved in an extensive check-fraud case and given immunity from prosecution in these crimes, which were similar to the forgery charges Applicant was facing. She had committed multiple crimes of dishonesty and had been given immunity from prosecution in exchange for her testimony, and this should have been used to impeach her credibility. Kershner, moreover, had been allowed by the police to steal Applicant's car, despite his attempts to report it stolen, and to drive it while her license was suspended for a drunk driving conviction (attachment 23). Again, this information was vital to impeachment and should have been elicited by Dreves-Randolph during Kershner's testimony. Kershner had also been convicted of assault for stabbing a man in the neck and was on probation.

**B.**   Warfield should have been impeached by Dreves-Randolph for a variety of unprofessional acts, overt biases, and civil rights violations perpetrated against Applicant. In addition to her reporting Applicant to the FBI as a domestic terrorist in response to a column he wrote for the Minneapolis *Star Tribune* and serving a retaliatory search warrant in reaction to Applicant's letter to the editor of the

Durango *Herald* (both attached to Petition for Writ of Habeas Corpus), Warfield cites Applicant's writing many times in her police reports, taking obvious offense (examples: attachments 4, 5, and 6), but denied any knowledge of Applicant's writing when asked on the witness stand, an overt instance of perjury that should have been exposed by Applicant's attorney; she had only to refer to Warfield's own police reports. Warfield also served a second retaliatory search warrant in 2004 when Applicant's no-bond hold had been dropped and he was preparing to bail out of jail. On the afternoon of the day the hold was vacated and Warfield was advised that Applicant was bonding out in accordance with the jail's booking instructions (attachment 24 [reads, "Call Rita Warfield if attempts to bond!"]), she went to the county jail with a search warrant, searched Applicant's cell, and fabricated bond violation charges purely to prevent his release. Warfield subsequently denied this in a hearing (attachment 25), another instance of perjury that could easily have been used to impeach her during the trial. Indeed, Warfield was essentially given a license to commit and suborn perjury by the La Plata County Court system, a fact that outraged Applicant's Crim.P.35(c) attorney, Bill Fritsche, when he became aware of this practice in La Plata County (attachments 26, 27, and 28), a practice so entrenched that the Applicant was powerless to do anything in response. Because she is a police officer, no one will investigate or charge Warfield with perjury; even Applicant's own attorney allowed it to go unchallenged, a denial of Applicant's constitutional right to effective representation. Dreves-Randolph also allowed Warfield to destroy evidence (attachment 29) and influence jail staff to violate Applicant's civil rights (attachment 30) without using these abuses to impeach her, an additional example of ineptitude borne of unpreparedness.

V.   Had Dreves-Randolph been afforded time to prepare and become conversant with Colorado law and court rules, she would have questioned trial witness Adam Howell

about his admission in a column written for the *Independent* college newspaper that he had constructed one of the parody flyers for which Applicant was charged and later convicted of several felonies (attachment 31); and would have objected to the multiplicity of instances where witnesses testified to hearsay, where the district attorney led witnesses and parroted witnesses' statements, reiterating them for the jury, a violation of Colorado court rules (attachment 32). Dreves-Randolph should have cross-examined Fort Lewis College staff members and students regarding the climate on campus that fostered and encouraged the use of the kind of scurrilous language Applicant was convicted of felonies and imprisoned for (attachment 33). Witness Arnold Villegas, furthermore, was allowed to commit perjury regarding charges filed against him for embezzling inmate funds while he worked as a jail guard, and witnesses Samantha Christenson and Lorie Davis were allowed to make witness statements that contradicted their earlier statements on police reports, which could easily have been related to the jury by Dreves-Randolph.

## Claim 5

I.    Respondent argues that this claim is barred because Applicant had the opportunity to raise it in State Court. While Applicant did preserve the issue in the appellate process and in his Crim.P.35(c), he never had the opportunity to present evidence of Warfield's second retaliatory search warrant (attachment 24), her subsequent perjury (attachment 25), and other examples of her monomaniacal vindictiveness. This evidence is surely germane in determining whether a search warrant was served against someone's critical speech to further one's personal antipathy, a violation of the First and Fourth Amendments. The totality of Warfield's conduct and her propensity for using search warrants as weapons to punish Applicant and further a personal agenda must be considered here.

II.   Respondent cites case law stating that when written material is seized "for any reason other than the content of the material, the First Amendment is not infringed and the scrupulous exactitude test does not apply." This principle clearly does not apply here, because Applicant's case was solely about content and expression—fake ads, websites, letters, phony sex offender flyers—that publicly ridiculed people. Respondent claims that because the affidavit listed a slew of charges—forgery, harassment, criminal impersonation—that the search warrants were served for something other than expressive content, but this is, at best, a facile argument. Just because an obsessed police detective with a strong personal dislike for Applicant, as the Respondent himself admits, attaches a laundry list of felonies to a search warrant does not negate the fact that the warrant was served for written content.

III.  The college stationery Respondent claims is "lacking expressive content entirely" was seized solely in response to prank letters the detective suspected were written by the Applicant. Letters are expressive content.

**Claim 6**

I.    Respondent claims here that images of the Alaska state seal were found on Applicant's computer hard drives in Colorado, but from the discovery it appears that all Alaska state logos were found in search warrants in hard print copy, not in PDF, JPG, or other downloaded image formats on Applicant's computers. This does not establish a nexus between Colorado and Seattle. Applicant was unable to find the "electronic copies of the state seal" Respondent references.

I hereby certify that a copy of the foregoing motion was sent via U.S. Post to the Colorado Attorney General on _December 15_____, 2015

_____
Davis Stephenson

### Durango Police Department
### Incident Narrative
### Incident #: 200235845_4.doc

1

Date:   061203                                    Detective  Rita Warfield

On September 10, 2002, while conducting a search of Stephenson's apartment for items related to the unauthorized use of a credit card, some paperwork caught my attention. There were documents that were made up to be sex offender flyers from several different states. One flyer was for Joanne Gantt, a secretary for Arnold Trujillo, Police Chief at FLC. We were fairly confident that Gantt was not a registered sex offender. Because we were looking for documents that might be in other people's names as that was an indicator in Stephenson's criminal behavior, we seized those documents and others that had personal information about FLC personnel. The information had been obtained through a county property website. We saw a computer on Stephenson's desk. His computer was on and his desktop was displayed. We saw a file called "Arnold Trujillo", "Gantt" and other files. We did not seize the computer at that time.

On September 12, 2002, another search warrant was written for Stephenson's apartment. During that search, an envelope containing a CD from Be Well Net was found that had been addressed to Marilyn Wood. Inside was a CD for Internet access for $9.95. It is unknown if this CD may have been used to set up an account in Wood's name or not.

On 052903, during that search warrant, a letter was found in the kitchen drawer addressed to Peaceful Spirits in Ignacio. The letter is about Wood and how she assaulted Stephenson in court and was charged. He was attempting to get her banned from volunteering at Peaceful Spirit and calls her violent, a racist, and a convicted criminal. It should be noted that while Wood was at court as a witness in Stephenson's malicious injury to property incident at her motel, Wood got upset with Stephenson and kicked him in court. She was subsequently charged with assault and got a deferred judgement on the incident. Wood told me that she was so upset with Stephenson and his attitude towards her that she kicked him even though she knew she shouldn't have. It was after this incident that Stephenson wrote to Peaceful Spirit.

Possible charges: Harassment, Criminal Slander, and Criminal Impersonation

Evidence: Sex Offender Flyer in Wood's name, letter and envelope to Wood, CD in envelope addressed to Wood, letter to Peaceful Spirit

D.A. RULE 16
000044

**Durango Police Department**
**Incident Narrative**
**Incident #: 200235845_18.doc**

Date:   103103                                   Detective   Rita Warfield

personalized plate "LIPSTIK".  Wood is not a sexual predator. At the time, she was sure that it was Stephenson who had made the poster, but she was unable to prove it.

On 071202, Wood called police about a letter she had received in the mail. The letter was addressed to her work at the Royal Motel and the return address was from a Will Preen, 1255 North, Durango, Colorado 81301.  The letter read, "Dear Marilyn, Love your web site! Did you design it yourself? I'm a "Leo the lion" too! Your birthday is on August 17, mine is on August 11. Are you really 57? I wish I could design a web site. But do you think it's a good idea to list all that personal information like that on the Internet so anybody can see it? Name, address, date of birth, social security number, phone number, it's all there! And you sure do have some strange sexual tastes. Aren't you afraid of being arrested? Fucking little kids and dogs is illegal, you know. Anyway, I guess I admire your honesty. What's your email address/let's write each other. Love ya, Will". Wood was sure that Stephenson wrote the letter, but at that time, officers did not have enough info to prove that case either.

During my search of Stephenson's house on 5/29/03, I found a letter that he had written to the staff at Peaceful Spirits in Ignacio, CO.  He knew that Wood was a volunteer at Peaceful Spirits. His letter stated that she was a violent, racist, and convicted criminal because of her assault on him in municipal court. He wanted her to prohibited from entering Peaceful Spirits and said that since she was a violent criminal she should not be allowed to do volunteer work there.

Wood said that she would certainly be involved in any case against Stephenson and felt that he should get life in prison for what he is doing to people.

ADDITIONAL ON WOOD: I sent the envelope the letter was sent in to CBI for DNA analysis. The poster and letter are similar in all parts to other evidence I have involving Stephenson with other victims.  Wood was a female in authority over Stephenson's living arrangements and because of their "falling out"; she became a target for his perverse retaliation.  Stephenson often uses fictitious names for his senders of letters.

Possible Charges:   Harassment, Stalking, Forgery, Criminal Libel, and Computer Crimes

Evidence:             Laminated sex offender poster
                      Letter from "Will Preen"
                      Handwritten notes from Wood
                      Letter to Peaceful Spirits
                      Colorado Dept. of Public Service logo taken off Stephenson's computer

3

mining what constitutes a matter of "public concern" (and thus the vast majority of New York private figure cases apply the "gross irresponsibility" standard.

Finally, a handful of states apply the actual malice [*Gross Negligence*] standard to all libel cases, regardless of the plaintiff's status. These states include Alaska, Colorado, Indiana, and New Jersey.

• Who is who?

Being able to determine whether the subject of a news story is a public official or a private figure bears directly on the amount of legal risk posed by the story.

While it is clear that not every government employee will be considered a public official for purposes of what they must prove in a libel case, the Supreme Court has yet to lay down definitive standards. Thus, the definition varies somewhat from state to state.

In New York, public officials are those who are elected or appointed to office and who appear to have substantial responsibility for control over public and governmental affairs. Judges, police officers, state troopers and corrections officers have all been held to be public officials under this standard. Similarly, in California, a public official is one who has, or appears to have, substantial responsibility for or control over the conduct of governmental affairs. In California, people found to be public officers have included a police officer, an assistant public defender, and an assistant district attorney.

Texas, in contrast, looks to the following criteria are relevant to determine whether a libel plaintiff is a public official: (1) the public interest in the position held by the plaintiff; (2) the authority possessed by the plaintiff to act on behalf of a government entity; (3) the amount of governmental funds controlled by the plaintiff; (4) the number of employees the official supervises; (5) the amount of contact between the plaintiff and the public; and (6) the extent to which the plaintiff acts in a representative capacity for the governmental entity or has any direct dealings with the government.

Under this standard, (1) a county sheriff; (2) a Child Protective Services specialist with authority to investigate charges of child abuse, remove children from their homes and place them in foster care, (3) an undercover narcotics agent employed by the state's law enforcement agency; (4) a ranking officer in charge of a narcotics squad of four men, (5) an individual who was a high school athletic director, head football coach and teacher, (6) an assistant regional administrator of a branch office of the Securities and Exchange Commission and (7) a part-time city attorney have all been found to be public officials.

But under the same Texas test, the following people were found not to be public officials: (1) a high school teacher; (2) a prominent member of two private organizations affiliated with a state university; (3) a former special counsel to a court of inquiry into county fund management; (4) a court reporter; and (5) an appointed justice of the peace (where the article appeared in a city where plaintiff was not justice of the peace and did not refer to plaintiff's official capacity).

While, at least at higher ranks, it is relatively easy to identify public officials, both reporters and the courts have confronted substantial dif-

ficulty in the area of public figures, particularly in separating those who are merely socially or professionally prominent from those who have, of their influence over public matters, are properly considered public figures for libel purposes.

For example, the 1976 case of Time v. Firestone stemmed from a magazine's account of the divorce of Russell and Mary Alice Firestone. The magazine said she had been divorced on grounds of "extreme cruelty and adultery." The court made no finding of adultery. She sued. Former Mrs. Firestone was a prominent social figure in Palm Beach, Florida, held press conferences in the course of the divorce proceedings. Yet the Supreme Court said she was not a public figure because "she did not assume any role of special prominence in the affairs of society," either... perhaps Palm Beach society, and she did not thrust herself to the front of any particular public controversy in order to influence resolution of the issues involved in it.

Similarly, Sen. William Proxmire of Wisconsin was sued for ... tion by Ronald Hutchinson, a research scientist who ... had received se... public grants, including one for $50,000. Proxmire gave Hutchinson ... "Golden Fleece" award, saying Hutchinson "has made a fortune from ... monkeys in the process made a mockery of the American taxpayer." Hutchinson sued. The Supreme Court held in 1979 trial, despite the ... cept of substantial public funds, Hutchinson was not a public figure because he held no particular sway over the resolution of matters of public concern.

Note also the case of Ira Wolston, who pleaded guilty in 1957 to criminal contempt for failing to appear before a grand jury investigating espionage. A book published in 1974 referred to those events. Wolston alleged that he had been libeled. In ... Wolston v. Reader's Digest, Supreme Court said that he was not a public figure. The court argued ... convicted of crimes and thus automatically become public figures. The court said, was thrust into the public spotlight unwillingly, long after the events of public concern had ended. (But, the Supreme Court also said, in a different context, that allegations of a general purpose a ... officials, no matter how far in the past, the conduct ... always relevant to their fitness for public office.)

(At bottom, although the Supreme Court has yet to definitively resolve the issue, the point appears to be that public figures are relatively responsible ... the limelight, who inject themselves into public debate, and who seek to influence public opinion on many matters may be deemed a "general purpose figure" and no matter whether the subject of a particular allegedly defamatory statement, Oprah Winfrey is an example of ... someone who likely would be deemed a general purpose public figure.

A person who seeks to influence public opinion in only one area, however, may be deemed a "limited purpose public figure." A person ... prove actual malice only with respect to allegedly defamatory statement about his or her animal rights activities. Limited purpose public figure have included: a prominent attorney; religious groups; a "city dancer; a "stripper for God," among others.

Durango Police Department
Incident Narrative
Incident #: 200235845_4.doc

*4*

**Date:** 061203                                         **Detective  Rita Warfield**

BASIS FOR INVESTIGATION: Over the past year, I have done extensive interviews and research into the possible harassment of several individuals that are acquaintances or otherwise know Davis Temple Stephenson.  When the first investigation began in reference to his unauthorized use of a credit card, I discovered through search warrants, information that leads me to believe that Stephenson harasses and intimidates victims through use of the computer and other correspondence. He may design a sex offender flyer using actual information on an individual that is a sex offender in some state and then alter the flyer to name an innocent person as a sex offender. I have evidence that he has attempted to send the flyer back to the issuing state to try to have that innocent person listed as a sex offender. I have evidence of three states he has altered sex offender flyers.

Another technique he uses is to send anonymous mail to his victims. Evidence shows letters to professors professing to be their lover or letters claiming to know about their website that may have explicit sexual material on it. In all cases, the websites he refers to were actually designed in those person's names by him. I have evidence from his computer that he did in fact design some websites in the names of other people. These websites and letters caused great anguish and potential danger to his victims.  He has also sent letters to victims in the names of their employers or supervisors attempting to get them in trouble at work. He sent an obituary for one victim to an Alaska newspaper, attempting to get it published. The obituary claimed the "deceased" (who is an assistant warden at the prison) had a homosexual background and that he died of aids.  He has targeted feminist activists, slandering them through obscene posters and constant verbal harassment and intimidation.  He has written letters to the Editor at the Durango Herald often criticizing police actions. One letter sent March 19, year unknown, was about too many officers in Durango. On one disk seized in a search warrant execution, a letter was found to the Editor of the Durango Herald in the name of a Jose Salazar supposedly supporting Stephenson's letter. This letter was obviously written by Stephenson using another person's actual or fictitious name to support his beliefs. Most, if not all, of his victims have been person's in positions of authority over Stephenson in some way or another. Two of his victims are from Alaska and were prison officials at the facility where Stephenson served time a few years ago. Over the past few years, until I discovered their information on his computer, they have worried about who was stalking them and sending the anonymous letters.

All of the victims have expressed concern and some have expressed fear of Stephenson based on his tactics.  His attempts to find information about their addresses, spouses or other personal information through the computer have unnerved them and they feel vulnerable to protect themselves. Fort Lewis College was aware of many of the harassment issues but was unwilling to do ban him from the college until he graduated and they learned I was working this case against him.

In this report and reports to follow, I will detail each victim and how they came to know Stephenson. This will show a pattern of harassment that Stephenson has developed and uses to intimidate his victims. I will show how he has altered government information to attempt to damage the reputation of people simply because they crossed him in some manner or exerted authority over him on an issue.  I will also show how he made websites and put personal information of his victims on the site and then advertised them to potential sexual predators, endangering these innocent victims lives. On

Durango Police Department
Incident Narrative
Incident #: 200235845_3.doc

5

ate:   060903

Detective  Rita Warfield

ORIGINATION OF CASE:   On 091002, I served a search warrant on the residence of Davis Temple Stephenson in reference to an Unauthorized Use of a Credit Card charge. (See Incident Numbers 2002-34725 [Eaker] and 2002-37312 [Denberg & Erway]). During the search I was looking for items that had other names and signatures than Stephenson's on them and several documents and items were collected that were suspicious in nature. One such document, was a paper that appeared to be a sex offender flyer.  On the flyer was a photograph of Joanne Gantt, known to be the secretary for Arnold Trujillo, FLC Police Chief. The flyer represented her as being a registered sex offender and it had the State of New Mexico Regulation and Licensing Dept. logo at the top. It appeared that Stephenson had attempted to email it back to this agency with her information on it.  It was suspected then and known now, that Gantt was not, nor never has been, a registered sex offender. On the flyer, Gantt's home and work addresses were listed. On that same date, I saw Stephenson's computer monitor on his desk. The computer was on and his desktop was displayed. On that screen, I saw several files listed, one which read Arnold Trujillo.

On 091202, another search warrant was executed in Stephenson's residence to obtain charges that Stephenson may have been using his computer to get online to commit fraud, criminal impersonation, harassment, and/or forgery.  The computer, disks, web page instruction manuals and additional computer generated paperwork was seized.

   ooked up the computer at the Police Dept. and over the next few weeks, obtained many of Stephenson's school assignments, correspondence, sex offender flyers, letters to the editor in reference to police harassment, and newsletter type flyers with articles slandering some FLC professors. I was beginning to confirm my suspicions that Stephenson was harassing certain individuals through mailings and Internet sources.

COMPUTER INFORMATION: Since I needed more advanced assistance on how to find deleted files and internet files, I contacted Nancy Floyd with the FBI and she took the computer and sent it to the Denver FBI office, where it was evaluated.  They had the hard drive for several months and experienced some difficulties getting information off it due to a virus in the system. They were able to get the information on a disk and it was then given to me.  The disk is dated 032403.  I then began to go through the disk to determine what information was on it.

I found extensive information linking Stephenson to harassment, criminal impersonation and forgery on multiple victims in Durango and Alaska. I began an extensive process of interviewing victims and witnesses.

I learned that Stephenson was accepting a plea in the case involving unauthorized use of a credit card and would be sentenced on June 20, 2003.  At that time he would agree to 1 year in the Dept. of Corrections, probation after that and restitution.  I obtained two search warrants; one for his residence to gather any unused FLC stationary and any suspect letters, items or documents   ertaining to the case I was working.  I also obtained another search warrant to collect DNA from the Stephenson's person.

**Durango Police Department**
**Incident Narrative**
**Incident #: 200235845_21.doc**

6

**Date:**   121903                                    **Detective**  Rita Warfield

other computers, such as ones at FLC, to do his work.  He has used the Internet to log on to public sites such as People Search, Parcel information sites, website development (Lycos, Geocites, Excite, Freeservers, to name a few).

Hiding behind our freedom of speech, he would use publications in newspapers to spread his opinion and often hostile feelings against police, white females, lesbians, feminists and anyone in authority that he felt was a threat to his control.  He read books like Power and Seduction to learn how to manipulate and use people to get what he wanted, with the blessing of his mother.  Using his charm and obviously being a man of high intelligence, Stephenson would at first be considered an attractive and personable man.  However, if he didn't get the grade he wanted or if he felt he was unduly treated, he would quickly yell that he was being discriminated against as a Native American and angrily demand that his situation be dealt with immediately. If things did not work out the way he wanted right away, Stephenson would resort to writing letters to employers often filled with lies about how he was discriminated against, jeopardizing jobs and causing concern that they were being harassed. Stephenson is a large male and many of his victims have said that he would stand up and move aggressively towards them, never touching them but giving the impression that he could and would.  He used his computer to generate libelous and distasteful posters against Editors at the Independent (FLC newspaper) causing them to fear for their safety.

letter found in Stephenson's apartment showed that he would even resort to writing fictitious letters in his own defense of letters he had sent to the Editor. Many of Stephenson's letters to the Durango Herald were controversial to many. A letter found on a floppy disk in Stephenson's apartment from "Jose Salazar" who supposedly lives at 527 E. 4th Avenue, is written in support of an letter he wrote to the Durango Herald in reference to there being too many police in Durango.

In the letter, Salazar supports Stephenson's letter to the Editor saying that "there are far too many cops, they have too few social skills, are much too young and have too much discretionary power, and most of them lack maturity and objectivity. The City Council should consider downsizing the Durango Police Dept." This letter was undated.  There is no such address as 527 E. 4th Avenue and Jose Salazar does not live there.  The Herald said they never ran such a letter, so I do not know if it was ever sent.

Stephenson's tactics are always the same. He starts out with Marilyn Wood, making a laminated sex offender poster in her name using a downloaded Colorado Dept. of Public Safety logo to make it look official. He has since progressed to more professional looking documents by becoming adept at website construction and downloading information onto his computer. Stephenson has forged official government documents to create sex offender posters All of Stephenson's victims are people he has had contact with who had some sort of control over him; either through the grades he received, the apartment he lived in, the corrections officer who directed his movement, the editors of the college paper he wrote for who determined what could or couldn't be published, the secretary who followed up on his handicapped parking status or the college police who enforced the college rules and regulations.

D.A. RULE 16
000107

# Fort Lewis *Men's Jester*

*Promoting free, uncensored press and acerbic satire since 2002*     **Issue I**

THIS IS
TASTELESS
AND
OFFENSIVE!

7

## FEMINISTS DIVIDE COLLEGE

It may have been inadvertent; perhaps it was deliberate.

But regardless of intent, Fort Lewis College feminists have once again vilified themselves in the eyes of much of FLC's staff and student body.

Repeated and angry outbursts, racism, reverse sexism, calls for oppressive legislation, opposition to First Amendment rights, and misuse of the academic environment in order to promote a biased political agenda have all contributed to the present state of alienation.

FLC English Professor Faron Scott defended her militant feminist practice of using college classrooms to promote her racially exclusive feminist/socialist agenda.

"We must use colleges to instill feminist thinking," she said. "Colleges are not meant for anything else."

"That's what colleges should be about: promoting feminist political ideology and socioeconomic agendas," Scott said.

FLC History Professor Doreen Hunter concurred.

See *Feminist* **page 2**

## HISTORY PROFESSOR HONORED

*Hunter receives Frieden award*

Fort Lewis College History Professor Doreen "Butch" Hunter was recently honored as "Dogmatist of the Year" by the National Betty Frieden Foundation.

"Doreen has very narrow, inflexible beliefs regarding feminist/socialist political indoctrination practices within colleges, and we want to express our gratitude to her for that," said Frieden Foundation Chair and bestselling feminist author Molly "Moe" Martin during the ceremony.

"I'm very grateful for this award, and I can assure you that I will continue to promote the feminist/socialist dogma within classrooms and proselytize this doctrine wherever possible," Hunter said. "Non-minority women must be afforded all the economic and political power, and impressionable young college students must be made to acknowledge and

See *Professor* page 2

## FEMINIST VOICE ALL WHITE ONCE AGAIN

The Fort Lewis College Feminist Voice is 100 percent white again this semester, a statistic that few find surprising.

"Basically, we're an organization that promotes the political and economic agendas of middle-class white female students," said Feminist Voice President Samantha "Sam" Roberts. "We'd love to be able to showcase some token minority women, but for some reason, they're not interested."

Feminist Voice member and *Independent* editor in chief Lorie Davis concurred.

"I don't know what that word 'minority' means," she said. "We don't use that kind of fancy-pants talk back in Oklahoma where I'm from."

"But if Sam said it, then it's got to be true," Davis said. "I just kind of go along with whatever Sam tells me is right."

Feminism is an institution that largely excludes poor women and women of color, said FLC Sociology Professor Dennis Lum.

"Feminism is about condemning males and

See *Voice* page 2

based memorization of feminist ideas," she said. "I don't care if students can read a book or write a history paper. I want them to be able to endlessly repeat feminist aphorisms."

FLC English Professor Jennie Dear also concurred, albeit with less personal conviction.

"I just go along with whatever Faron and Doreen say," Dear said. "My dad and cousin used to tell me to 'go along to get along.'"

"Actually, my dad and cousin are the same person, so I guess that's a little redundant," Dear said, laughing hoarsely and wiping a gob of phlegm from her left eye.

"That's how we do ...gs back in ol' ...ntucky," she chuckled. "Hell, we're all related back in the hills."

Some staff members and students oppose the use of classrooms as racially exclusive political indoctrination centers.

"FLC seems to be more of a Euro-American feminist brainwashing center than an institute of higher learning," said FLC Sociology Department Chair Jim Fitzgerald. "It's not right."

Many students agree.

"These feminist professors and students have really divided the campus," said FLC senior John Wright. "I hope they're happy."

they're young and vulnerable and then mold them into good little feminists," Hunter said.

Hunter said that feminist professors must employ pretentious anti-racist rhetoric in the classroom to absolve non-minority women of centuries of racism.

"We must assert that it's only white males who are to blame," she said.

Feminist professors from other academic departments were also present at the honoring ceremony.

*Voice* **from page 1**
acquiring more money and power for bourgeois, dominant-culture women," he said.

Roberts agreed, but took offense at Lum's acknowledgement of the facts.

"Of course we only want more money and political power for ourselves," she said. "But we're not supposed to talk about that."

"This is why feminists support censorship," Roberts said. "I don't care if it's true, you can't say or print it."

Davis again concurred: "If Sam says not to say or publish something, then I don't," she said. "Sam knows best. I'm just a simple Okie."

FLC Porn Professor Michele Malach also

Scott. "I have always been a very committed and intransigent feminist dogmatist."

"My courses and lectures never acknowledge anything other than censorist socialist/feminism," she said. "Maybe I pay a little too much lip service to minorities when I should be focusing on middle-class white women."

"Minorities should only be used as cultural tokens or vehicles to promote Anglo feminism," Scott said. "They must be kept perpetually dependent."

supports unmitigated feminist censorship.

"I should be able to show full-length pornographic films to young kids anytime I feel that it's appropriate," she said. "But if someone says or writes something that is threatening to feminism, socialism, political correctness, or other liberalist/leftist institutions, then we must suppress it."

"We, the elite feminist academics, must decide what people can see, hear, and read," Malach declared. "They just have to trust our judgment."

"The Feminist Voice desperately wants to be part of that censorship process," Roberts said. "After all, we are an organization of middle-class, politically correct, female college students."

000209

D.A. RULE 16

# R RIGHTS VIOLATED?

*8*

H.                              C POLICE CONDUCTED AN UNWARRANTED SEARCH OF YOUR HOME, APARTMENT OR ROOM?

HAS YOUR DOOR BEEN KICKED IN OR HAVE THE POLICE OTHERWISE FORCED THEIR WAY INTO YOUR HOME?

HAVE YOU BEEN BEATEN, PEPPER-SPRAYED, OR OTHERWISE ASSAULTED BY THE POLICE?

HAVE YOU BEEN BULLIED OR INTIMIDATED INTO TALKING TO THE POLICE OR SUBMITTING TO URINALYSIS TESTING?

HAVE YOU BEEN PULLED OVER AT ANY OF THE SPEED-TRAPS THAT TRADITIONALLY HAVE SURROUNDED FLC?

HAS YOUR CAR BEEN TARGETED BY THE POLICE SIMPLY BECAUSE IT HAS AN FLC PARKING STICKER?

HAVE YOUR BASIC CONSTITUTIONAL RIGHTS BEEN VIOLATED IN ANY WAY BY THE POLICE?

IF SO, HELP US HELP YOU! CALL OR E-MAIL *INDEPENDENT* REPORTER DAVE STEPHENSON
(970) 247-4264
stephenson101@hotmail.com

D.A. RULE 16

000210

9



# HAVE YOU OBSERVED OR BEEN THE

# VICTIM OF

# ANTI-MALE

# SEXISM

## BY EXTREMIST FEMINIST PROFESSORS OR STUDENTS AT FLC (OR ELSEWHERE)?

IF SO, THEN HELP US HELP YOU!
CONTACT REPORTER DAVE STEPHENSON AT
*THE INDEPENDENT* (970) 247-7405

D.A. RULE 16

000211

10

# Paramilitary Police are Worse than Bikers

TO THE EDITOR:

This year's Iron Horse Motorcycle Rally has been officially cancelled, but innumerable bikers have already made hotel and motel reservations, and many others will flock to Durango on Labor Day weekend. The rally will proceed, officially or unofficially.

Citizens in Steamboat, Colo., Ventura, Calif., Laughlin, Nev., Gunnison, Colo., and other western cities where motorcycle rallies have been held and motorcycle clubs have congregated agree on at least one thing: the massive police presence that typically accompanies these events is far worse than the bikers themselves.

During last year's rally, the Hell's Angels blocked a Durango stoplight in order to permit their cavalcade to pass through the intersection. A shooting occurred during the River Run Rally in Laughlin earlier this year.

The local police are using those occurrences as excuses for planning an increase in an already oppressive police presence in La Plata County. During Labor Day weekend, they'll bring in additional officers in order to produce and maintain martial, militarized environment. But even paramilitary police are afraid to tangle with groups of bikers, so they'll persecute local citizens and individual bikers instead.

During last year's rally, a group of Fort Lewis College students were attacked, beaten, and pepper-sprayed by camouflage-clad paramilitary troops during a Labor Day party. Local motorists, solitary bikers, and revelers were harassed en masse.

A shootout on Main Avenue between rival motorcycle clubs is preferable to jackbooted Gestapo agents, secret police, and an armed military force victimizing local kids and citizens.

This Labor Day weekend, don't worry about the bikers; they're generally harmless and peaceful, and motorcycle club members only hurt one another or those who foolishly provoke them.

This Labor Day weekend, don't worry about the bikers; worry about the massive, oppressive paramilitary presence in our midst.

Dave Stephenson

P.S. I have taped interviews, including one with Durango Police Sergeant Tony Archuleta, and newspaper clips that confirm the Labor Day incident.

Here is my latest manifesto: Let me know if you have any suggestions!

Word count: 1748

# Feminism: minority and majority

Heterosexual white Americans, whether male or female, make for rather unconvincing revolutionaries.

Those who are already members of the self-declared master race, the dominant culture, the singular superpower, and who are members of a racial and sexual majority that far outnumbers the others have absolutely no reason to rebel and nothing to rebel against.

Aldous Huxley wrote: "All animals are equal, but some are more equal than others."

White feminists, notwithstanding their protestations and ministrations, comprise the majority of the "more than equal" master race and are equally responsible as men for the institutions of white privilege that ensure their continued superiority.

As the liberal white feminists pay pretentious, condescending lip service to minority rights and cultural sensitivity, they strive just as diligently and toil just as sedulously as the conservative, Republican, old-school white male to make certain that white privilege is maintained and that positions of power continue to be occupied by members of their race. As the African American feminist and author Patricia Hill Collins observed, "White women have been offered a share of white male power."

A white liberal feminist will concede that minorities are underprivileged, but will never admit that she is overprivileged; indeed, such an admission would mean admitting that colonial cultural dominance, predicated on race, is as much in effect in 21st century America as it was in 18th century America, and that her political and socioeconomic power is derived mainly from skin color.

Such an admission would mean that the institutions of racial dominance would have to be confronted and subverted.

Such an admission would mean that the racial superiority that all white Americans benefit from might begin to crumble.

And all Americans, regardless of ethnicity or gender, have been socialized, educated, and conditioned since birth to perceive whiteness as superior, as normative, as the ideal.

But we are simultaneously taught to remain oblivious to white privilege, to pretend that it does not exist, and to believe that all Americans share equal advantages. This is a recent cultural taboo, largely created and promoted by liberal white feminists and endorsed by the news and entertainment media propaganda machines; it is a taboo that restricts or prohibits the acknowledgement of race and racial privilege.

Ironically, these restrictions, which were imposed by liberal white feminists, have the effect of ensuring the continuation of white privilege, because the ironies and paradoxes inherent in their pretensions of equality, diversity and cultural sensitivity can no longer be acknowledged.

This paradox is cogently and lucidly illustrated by the rhetoric at the recent meeting of the Fort Lewis College Publications Committee: The liberal, pro-feminist committee called for the Independent to hire

D.A. RULE 18          000169

more minorities, then ushered the few minorities in attendance from the room, so that the committee could discuss matters of import in private without minority interference. This mirthful irony couldn't be adverted to in print, because of the liberalist mandate that white racial privilege never be admitted to.

While the liberal feminists call for diversity and equal opportunity, they simultaneously ensure the preservation of unilateral white power, all the while mandating that this practice and its racial parameters not be acknowledged. It is a specter that is far more treacherous and deleterious than white men with white hoods and burning crosses.

As the white feminist author Peggy McIntosh wrote in her essay on male privilege, there is a "phenomenon of white privilege that is similarly denied and protected...white privilege is an invisible package of unearned assets that I can count on cashing each day, but about which I was meant to remain oblivious."

Like the silent convention of racial privilege, McIntosh's voice will remain unheeded and unheard in the liberal white feminist community.

The institution of white privilege and the racial stratification of America has resulted in what Alfred Adler termed a "national narcissism," a collective self-interest and megalomania that all white Americans share: from inbred, toothless, illiterate Ozark Annie, to Gloria Steinem, to Bill Gates, the old-money multibillionaire Microsoft magnate.

All white Americans are educated to believe that American culture and even civilization itself was created by their people.

History is a mythologized, propagandized, interpolated, occluded, manufactured recounting of the ostensible glory of the Euro-American race, and we all are taught to regard it as being infallible and incontrovertible.

White Americans are the media standard: As McIntosh observes, "I can turn on the television or go to the front page of the newspaper and see people of my race widely represented."

A white American can visit or move to virtually anywhere in the country without being victimized or ostracized, as a minority would be.

White Americans can be pulled over by the police or appear in court without fearing that their race will be used against tem.

Euro-Americans are 10 times as likely as minorities to attend college.

In colleges, white students don't have to worry about being unfairly graded or inspiring some inexplicable, irrational, primordial fear in the hearts of their professors, as minority students do.

And a lifetime of job opportunities, respect, empowerment, economic opportunities, and deference will be afforded to them, predicated solely on race.

These and myriad other advantages are afforded to white Americans throughout their lives; despite the mawkish mantras of diversity and multiculturalism, a white liberal feminist has as much a vested interest in maintaining racial advantages as any other white American.

D.A. RULE 16   000170

These unctuous mantras have actually evolved into euphemisms for racism and white privilege, inasmuch as they insidiously perpetuate cultural dominance while professing ignorance of it.

Whiteness is a purely political construct, invented during the age of European colonization in order to separate the colonizers from the colonized.

Before whiteness was invented, Europeans identified themselves by national provenance: as French, English or Spanish, or more commonly, as Christian. But as the invading colonists began to convert Natives to Christianity, they needed some other means of marginalizing others and denoting their presumed superiority, so whiteness was invented.

Colonialism ends when the marginalization ceases, the colonists go home, the hegemony ends, and the land reverts back to Native ownership. The United States is still a colony, and Native Americans are still a colonized people.

And it is Native women who have suffered most from the effects of white colonization.

The fraudulent treaties, biological and conventional wars of extermination, racism, forced assimilation and forced relocation have impacted all Natives, regardless of gender.

But it is the rapes, massacres, sexual mutilations, kidnappings, forced sterilizations, and the government boarding school system that have impinged upon Native women far more than upon Native men.

It was a common practice in the 19th century for whites to wait until Native men had gone hunting and then descend upon Indian villages, raping, mutilating, and murdering the children and women.

Unborn babies would be carved from their mother's stomachs, women's breasts would be cut off, their uteruses would be carved out and worn on the head as a kind of macabre cap, and all would be murdered.

Many Americans have been conditioned to believe that these were aberrational acts that occurred only at sites such as Sand Creek and Wounded Knee, but they were commonplace in North America for hundreds of years. The most prolific massacres took place on the coasts: in California during the Gold Rush years, and on the eastern seaboard during the initial stages of the Anglo invasion. The massacres on the plains were not nearly as extreme.

For more than a century, babies were torn from their mother's arms and sent to government boarding schools where they were beaten with garden hoses and often sexually abused; most of these boarding school children were never reunited with their mothers. This is a practice that ended only recently; FLC was once one of those Indian boarding schools.

In the 1970s, 42 percent of Native American women of child-bearing age were forcibly surgically sterilized by the white American government; some were little girls as young as 15 years old who were told they were having their tonsils removed. They emerged from government clinics lacking ovaries, having been given forced hysterectomies. Ironically, their tonsils were still intact.

Forced assimilation and forced relocation continue even today.

The colonial racist institutions that have engendered these atrocities were created by white women as much as by white men, and Native women don't profit from white privilege or have an interest in

D.A. RULE 16

000171

perpetuating it, which is why there must be a separation between white feminism and Native feminism.

White feminism is racial privilege, racial condescension, anti-male sexism, and an attempt to perpetuate racial power and control. It is not tied to cultural identity, as Native feminism is, but is defined by its objective of seizing cultural dominance.

As the Lakota/Laguna Pueblo feminist author Paula Gunn Allen wrote, "An American Indian woman is primarily identified by her tribal identity." Native feminists are members of their culture first and foremost, and this is why Native women feel a greater affinity and solidarity with Native men than they do with white women.

Native women are struggling against racial oppression, gender oppression, and endeavoring to preserve a matrilineal, gynocratic culture in which they are influential, potent and respected. Conversely, white women are struggling with white men for a greater share of white privilege.

Native feminists are also fighting against the paternalism, condescension, and imperious nature of the white liberal feminist, who would presume to legislate morality, gaming laws, gun laws, and reproductive rights for her people.

Native feminists are also fighting for their people's sovereignty and self-determination, which the liberal white feminist seeks to subvert.

African American and Chicana feminists are engaged in comparable struggles, fighting as much against liberal white feminist condescension and racism as they are against gender oppression.

As the Pulitzer Prize-winning African American author and poet Alice Walker wrote, "It occurred to me that perhaps white women feminists, no less than white women generally, cannot imagine Black women as women. Perhaps it is the Black women's children, whom the white woman, having more to offer her own children, and certainly not having to offer them slavery, a slave heritage, poverty, hatred, segregated schools, slum neighborhoods, the worst of everything, resents. Better then to deny that the Black woman is a woman."

White women are, of course, equally culpable as white men in creating the conditions Walker wrote about.

And heterosexual white feminists continue to struggle with white men to determine who receives the lion's share of white privilege and entitlement

D.A. RULE 16

000172

Dave Stephenson
PO BOX 3731
Durango, Colo.
(970) 247-4264
stephenson101@hotmail.com

12

**WORD COUNT: 242**

TO THE EDITOR:

The Durango Police Department, which has several lawsuits pending against it, is a paramilitary force run amuck on the city's streets.

From brutal beatings to unwarranted invasions of homes and businesses, the Durango police have allegedly perpetrated myriad illegal acts in recent years, and have yet to be held accountable.

Joseph Crudup's recent lawsuit alleges the police invaded and seized control of his home without even first obtaining a search warrant.

The irony of the Crudup lawsuit is that Durango police can easily obtain search warrants and other forms of bureaucratic largesse from local court officials who routinely defer to their friends within the police department and trample upon the rights of ordinary citizens.

Other pending lawsuits allege chemical assaults and sadistic acts of violence.

The Durango police are neither protecting nor representing the community; they are simply an occupying paramilitary force drunk with power and confident of the support of courts that appear slanted in their favor.

Lord Acton wrote, "Power corrupts, and absolute power corrupts absolutely." If the police are afforded unmitigated authority and a license to arbitrarily violate our rights, then they are, ipso facto, afforded absolute power. Absolute corruption and notions of infallibility are sure to follow.

When the Durango police are not held accountable for violations of citizens' rights, it's not only their victims who suffer—it's all Durangoans, all Coloradoans, and all Americans who truly care about the principles upon which our great nation was founded

*[handwritten, illegible]*

D.A. RULE 16

000182

# Top 10 Things You Can Say
# To A White Person Upon First Meeting:

13

10. *How much white are you?*

9. *I'm part white myself, you know.*

8. *I learned all your people's ways in the Boy Scouts (Order of the Bullet).*

7. *My great-great-grandmother was a full-blooded white-American princess.*

6. *Funny, you don't look white.*

5. *Where's your powdered wig and knickers?*

4. *Do you live in a covered wagon?*

3. *What's the sacred meaning behind the square dance?*

2. *What's your feeling about Las Vegas casinos? Do they really help your people, or are they just a short-term fix?*

1. *Oh wow, I really love your hair! Can I touch it?*

André Cramblit, Operations Director-Northern California Indian Development Council

Posted by Dave

D.A. RULE 18

000183

*14*

PO BOX 3731
Durango, CO 81302
(970) 247-4264
stephenson101@hotmail.com

ACLU Intake Department
400 Corona
Denver, CO 80218

September 2, 2003

Greetings:

I was recently subjected to a search warrant executed by the Durango Police; this is the third search warrant granted against me in the last few months. The most recent search warrant was requested and executed, not coincidentally, on the same day I ran a "letter to the editor" in the *Durango Herald* that criticized the police. It was, quite obviously, a retaliatory measure.

I have also been subjected to repeated false accusations by Durango's Fort Lewis College Police, and I have been repeatedly censored, harassed, and falsely accused by Fort Lewis College professors while a student. I believe these incidents were precipitated by my writing, both before and after graduating college.

I am a freelance reporter and correspondent with *Indian Country Today*, a national Native American newspaper. My opinion pieces in Durango have always been overtly critical of the police and Anglo-American academic feminists; the protracted harassment is predicated on my journalistic criticisms. I believe my First Amendment rights have been violated by the aforesaid agencies.

Please see the attached search warrant and letter.

I can provide audiotapes, documents, and witness accounts attesting to the other instances of harassment.

Sincerely,

Dave Stephenson

D.A. RULE 10

000187

  (b) The respondent agreed the attorney fees for the case would be $25,000, but then requested and received $2,500 for the interlocutory appeal.

66. By such conduct, the respondent violated Colo. RPC 1.5(a).

WHEREFORE, the complainant prays at the conclusion hereof.

## Stephenson Matter

67. Respondent was asked by Judge David Dickinson if she would accept a court appointment to represent Davis Stephenson ("Stephenson") regarding criminal charges against Stephenson.

68. The respondent represented Stephenson at trial.

69. He was convicted on all charges, which included: five counts of criminal libel, seven counts of forgery, four counts of possession of forged instruments, eight counts of criminal impersonation, and two counts of stalking in *People v. Davis T. Stephenson*, case no. 04CR95 (La Plata County District Court).

70. Stephenson requested the respondent represent him for an appeal of the conviction.

71. The respondent agreed and entered into a fee agreement for $9,500 for the appeal.

72. The respondent designated the following for the record on appeal: pre-trial conference transcript; motions hearing transcript; jury instruction argument and court ruling; and all exhibits.

73. The respondent **did not** designate the trial transcript.

74. The arguments the respondent made on appeal included the following: Colorado's criminal libel statute is unconstitutionally vague and overbroad; Colorado's stalking statute is unconstitutionally vague and overbroad; the trial court erred in denying Stephenson's motion to suppress evidence obtained through illegal search warrants; and Stephenson was improperly convicted of forgery and possession of a forged instrument.

75. By decision dated March 6, 2008, the Court of Appeals affirmed the conviction.

76. In the decision, the court noted multiple times that the defendant failed to provide a complete record, such that the court presumed the record

supported the judgment.

77.   Stephenson, through new counsel, filed a petition for certiorari with the Colorado Supreme Court.

78.   The petition was denied on April 21, 2009.

## CLAIM V
### [A Lawyer Shall Provide Competent Representation To A Client - Colo. RPC 1.1]

79.   Paragraphs 67 through 78 are incorporated herein as if fully set forth.

80.   Colo. RPC 1.1 provides that a lawyer shall provide competent representation to a client, and that competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

81.   The respondent failed to provide her client competent legal representation by failing to designate the necessary portions of the record for the appeal.

82.   The respondent knew or should have known that she was failing to provide competent legal representation to the client, but made no effort to remedy the situation.

83.   The respondent's failure to provide competent legal representation to the client caused injury or potential injury to the client.

84.   By such conduct, the respondent violated Colo. RPC 1.1.

WHEREFORE, the people pray that the respondent be found to have engaged in misconduct under C.R.C.P. 251.5 and the Colorado Rules of Professional Conduct as specified above; the respondent be appropriately disciplined for such misconduct; the respondent be required to refund fees to the client, and/or the client protection fund pursuant to C.R.C.P. 252.14(b), and/or provide restitution to third parties; the respondent be required to return client files (or other client property); the respondent be required to take any other remedial action appropriate under the circumstances; and the respondent be assessed the costs of this proceeding.

DATED this _29th_ day of September, 2010.

Respectfully submitted,

*s/ April M. McMurrey*

April M. McMurrey, #34194
Assistant Regulation Counsel
John S. Gleason, #15011
Regulation Counsel

Attorneys for Complainant

**COLORADO SUPREME COURT**
**ATTORNEY REGULATION COUNSEL**



16

Regulation Counsel
John S. Gleason

Chief Deputy Regulation Counsel
James C. Coyle

Chief Deputy Regulation Counsel
Jamie S. Sudler

First Assistant Regulation Counsel
Charles E. Mortimer, Jr.

Regulation Counsel
Amy C. DeVan
Ericka Houck Englert
Adam J. Espinosa
Stephen R. Fatzinger
Lisa E. Frankel
Margaret B. Funk
Kim E. Ikeler
Elizabeth Espinosa Krupa
Cynthia D. Mares
April M. McMurrey
Katrin Miller Rothgery
Matthew A. Samuelson
Louise Culberson-Smith

Attorneys' Fund for Client Protection
Unauthorized Practice of Law

May 31, 2011

Davis T. Stephenson, #118218
SCF
P.O. Box 6000
Sterling, CO 80751

     Re:  Your request for investigation of Rae Lyn Dreves, 09-01998
           Case No. 10PDJ105

Dear Mr. Stephenson:

    Please be advised that Ms. Dreves and the Office of Attorney Regulation Counsel have entered into a Stipulation, Agreement and Affidavit Containing Respondent's Conditional Admission of Misconduct.

    Enclosed please find a copy of the Stipulation and Presiding Disciplinary Judge's Order approving the Stipulation. If you have any questions, please feel free to contact me.

                  Sincerely,

                  April M. McMurrey
                  Assistant Regulation Counsel

AMM/kef
Enclosure
cc: Michael McLachlan, Esq.

18

| | |
|---|---|
| **From:** | Lauretta Neff |
| **To:** | Bill Fritsche |
| **Subject:** | Beneficial Changes in the Law briefing |
| **Date:** | Monday, November 12, 2012 10:00:42 AM |
| **Attachments:** | M-Post Conviction.wpd |

Greetings Bill!

I meant to send this briefing to you last week but got caught up in the fray of work. We talked about this over lunch for your Davis Stephenson case. I'm attaching my entire post-c motion, but the second issue is the one you're interested in: beneficial changes in the law. There is a response that can be made to rebut the argument, even though our local DA did not figure it out. But be prepared for your DA to argue that the particular law's applicability date defeats the benefit of the change to incidents that occurred before that date. You might be able to argue that the statutory applicability date applies to cases that are final before that date rather than the incident date. Probably a long shot, but worth checking out.

Also, I was feeling a bit bad about how Rae Dreves handled Davis's appeal and wanted to make sure you knew that I had no knowledge of or participation in her failure to designate and provide a record on appeal. I did some legal research for her and wrote some of the argument based on her representations of the facts. She said she'd find all the record citations because she did the trial and knew where to look for them. It was much later (probably when the People moved to dismiss the appeal or otherwise raised the issue of having no record) that she told me she hadn't provided a record for lack of funds from Davis. Of course, I recommended that she immediately move to designate and provide the record. Apparently she didn't do that. Just wanted to clarify that to remove myself from the ineffectiveness.

Best to you and Barbara!

Lauretta


**Lauretta A. Martin Neff, Esq.**
**Attorney at Law**
**871 Lydick Lane**
**Bayfield, CO  81122**
**T: 970-884-8338**
**C: 970-260-3039**
**F: 907-884-5244**
**E: lauretta.neff@neffservices.com**

19

2005 NOV 18 PM 1:48

FILED IN COMBINED COURT
LA PLATA COUNTY, COLO.

| | |
|---|---|
| **DISTRICT COURT**<br>**LA PLATA COUNTY COLORADO**<br>Court Address: 1060 East 2nd Ave., Durango, CO 81301<br>Phone Number: (970) 247-2304 | |
| **Plaintiff(s): PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**Defendant(s):** Davis Temple Stephenson | Δ COURT USE ONLY Δ |
| Rae L. Dreves,   Attorney at Law<br>P.O. Box 3088<br>Durango, Colorado 81302<br>Phone Number: (970)247-2017<br>Fax Number: (970) 259-3584<br>E-mail: rldreves@bresnan.net<br>Atty. Reg. #: 37047 | Case Number:<br>05CR116<br>05CR120<br>04CR95<br><br>Div.:          Ctrm.: |
| **DEFENDANT'S MOTION FOR CONTINUANCE OF TRIAL** | |

COMES NOW Rae L. Dreves and hereby moves this Honorable Court for an Order continuing the trial in the matter 04CR95 or in the alternative for an Order continuing the matters 05CR116 and 04CR120.  As grounds for this motion the undersigned states the following:

**I.   The Trial Date for 04CR95 Should Be Continued**

The grant or denial of a motion to continue rests with the sound discretion of the trial court and will not be overturned on review absent an abuse of that discretion and a showing of actual prejudice by the defendant.  <u>People v. Shuett</u>, 819 P.2d 1062 (Colo. App. 1991), *rev'd on other grounds*, <u>People v. Schuett</u>, 833 P.2d 44 (Colo. 1992).  The Defendant brings this motion for the purpose of setting forth to the Court actual prejudice that will occur in the event he is required to go to trial in the matter 04CR95 on January 17, 2006 as currently scheduled.

As the Court is aware, Defendant's attorney Eric Sanford's Motion to Withdraw as Counsel of Record was only recently granted in light of the fact of his current counsel's licensure with the

Bar of the State of Colorado.[1]   Prior to that time Attorney Sanford had completed little preparation on the matters at issue on this case, and Mr. Sanford's investigator had not initiated any investigation into the approximate 1200 pages of discovery from the State.[2]   The undersigned began in earnest the preparation of this matter once she was formally licensed with the State of Colorado.  It became obvious at once that behind the veil of the 28 count indictment is a voluminous file of Constitutional proportions.

As of the date of the preparation of this motion, Ms. Garcia, the investigator, had reviewed approximately 350 of the 1200 pages of discovery and had uncovered the names of 72 potential witnesses to be interviewed in the preparation of this case.  This list did not include the names of the currently endorsed witnesses from the State.

The Sixth Amendment right of Defendant to effective assistance of counsel will be compromised in the event 04CR95 is not continued.  The State, though prepared to go to trial on this matter, will not sustain any type of prejudice if a continuance is granted.  The Defendant, however, will be prejudiced by counsel's inability to fully and adequately interview the vast number of witnesses named in this case, and also to appropriately prepare for the complex Constitutional issues that it will bring before this Court.

Finally, the Tenth Circuit Court of Appeals will be considering the matter of <u>Thomas Mink and The Howling Pig v. Ken Salazar</u> for oral argument on January 9, 2006.  This case concerns some of the same Constitutional issues that are before the Court in 04CR95.  It would be of great

---

[1] Attorney Sanford's Motion to Withdraw was granted by this Court on November 16, 2005.
[2] Attorney Sanford and Investigator Garcia were busy with the investigation and preparation of Defendant's other matters before this Court, 05CR120, 05CR116, and 04CR209.

2

benefit to all parties and the Court to continue the trial of Defendant's matter until we have the benefit of guidance from the Tenth Circuit on these issues.

## II. In the Alternative, Case Numbers 05CR116 and 05CR120 Should be Continued

Even if this Court is not inclined to grant a continuance in 04CR95, Defendant requests a continuance of the trials of 05CR116 and 05CR120 in order to be able to more fully concentrate of the preparation of 04CR95.

WHEREFORE, it is requested that this Honorable Court continue the trial of 04CR95 scheduled for January 17, 2006 or in the alternative, continue the trial dates set for 05CR116 scheduled for January 9, 2006 and 05CR120 scheduled for February 13, 2006.

Respectfully submitted this 17th day of November, 2005.

Rae L. Dreves, #37047
Attorney for Defendant

I HEREBY CERTIFY that on this 17th day of November, 2005, I placed a true and correct copy of the foregoing Motion in the Courthouse box of the District Attorney.

Rae L. Dreves
Attorney for Defendant

3

<hr>

lack of preparation

<hr>

Gmail          Back      Archive     Spam     Delete     Move to Inbox     Labels     More

<hr>

**COMPOSE**

Inbox

Sent Mail

Drafts

All Mail

Spam (8)

Trash

Categories

Dave

Trying to reconnect...

Learn more

Make a call

----- Original Message -----
From: <lfehh@mail.uas.alaska.edu>
To: <rldreves@bresnan.net>
Sent: Wednesday, January 03, 2007 8:34 AM
Subject: Address and Question

> Hello Rae. Now that holidays are over and the campus is open again,
> I'm going to mail a copy of my book to you in the hopes that you might
> find time to read some of it (it's been receiving good reviews, and I
> think you'll enjoy parts of its stories). I'd like to make sure the
> address I have is correct: 530 Main Avenue Suite B P.O. Box 1641
> Durango CO 81302. This is from an old email, so I'd like to be sure
> it's correct before I send it.
>
> Dave has asked me to inquire whether there will be a chance to address
> the issues of jury instructions and lack of preparation time in the
> appeal process. He didn't see these important points discussed in the
> opening brief, and he'd like to make sure they're brought up.
> Additionally, I have a question that's been on my mind: did you
> receive copies of all the emails I'd sent him over the months before
> his arrest, one of which was brought up at trial (the Art of War)? I
> sent Dave dozens of emails, almost all of which were advising him in a
> positive way, and for them to take one out of context presented me in
> an untruthful light and cast doubt on my credibility as a witness. If
> some of the other emails had been presented, it probably would have
> cast my testimony in a more favorable light with the jury. So I was
> wondering if you'd seen all those other emails.
>
> Thanks again for all your hard work and your patience and dedication
> to the cause of justice for my son. Please let me know about your
> address. I look forward to receiving information on his appeal. Have a
> bright and successful new year. E.
>
>

*21*

**DEFENSE COPY**
*Schowalter*
*D.T.Stephenson*
*04CR75*

| | |
|---|---|
| **DISTRICT/ COUNTY COURT, LA PLATA COUNTY, COLORADO**<br>Court Address: 1060 E. Second Avenue<br>Phone Number: (970) 247-2304<br><br>**Plaintiff:** People of the State of Colorado<br><br>**Defendant:** Amanda Kershner<br><br>**OFFICERS NAME** Cindi Clay<br>Phone Number: 970-375-4738<br>Fax Number: 970-375-4718<br>E-mail: claycl@ci.durango.co.us<br>DPD Case Number: 200533263 | 2005 JUN 31<br>**FILED**<br>☐ COURT USE ONLY ☐<br>LA PLATA COUNTY, COLO.<br><br>**Case Number:**<br><br>Div.:          Ctrm.:<br><br>*05 CR 300* |
| **ARREST WARRANT** | |

THE PEOPLE OF THE STATE OF COLORADO:

   TO: Any person authorized to execute warrants within the State of Colorado and elsewhere, Greetings:

   You are hereby commanded to arrest Amanda Kershner   *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*

Date of Birth: 05/05/1969, Height: 5'06", Weight: 170 lbs, Eyes: Brown, Hair: Brown, Female,

and bring him/her with unnecessary delay before the nearest judge of Court of record to be advised of the charge(s) of:

   Check Fraud CRS §18-5-205, CLASS 6 Felony,

probable cause having been established by Affidavit(s), sworn to before a Judge.

   Defendant is to be advised that there is probable cause to believe that he/she has violated Colorado Revised Statutes, 1973, §18-5-205 as amended.

   Bail is fixed in the amount of $ *3,000* , with the bond returnable in La Plata County Court, La Plata County Courthouse, 1060 E 2nd Avenue, Durango, Colorado, on Friday at 01:30pm in the District Court.


Date: _____*7/1/05*_____


_____
Judge


Combined Court, County of La Plata
State of Colorado
Sixth Judicial District
Certified to be a full true ...

D.A. RULE 18
00871

*22*

| | |
|---|---|
| **DISTRICT/ COUNTY COURT, LA PLATA COUNTY, COLORADO**<br>Court Address:    1060 E. Second Avenue<br>Phone Number:    (970) 247-2304<br><br>**Plaintiff:**    People of the State of Colorado<br><br>**Defendant: Amanda Kershner**<br><br>**OFFICERS NAME Cindi Clay**<br>Phone Number: 970-375-4738<br>Fax Number: 970-375-4718<br>E-mail: claycl@ci.durango.co.us<br>**DPD Case Number: 200533263** | *(Defense copy)*<br><br><br>◻ **COURT USE ONLY** ◻<br><br>**Case Number:**<br><br>**Div.:**              **Ctrm.:** |

## AFFIDAVIT FOR
## ARREST WARRANT

State of Colorado } ss.
County of La Plata }

Before the Honorable Judge Martha Minot, La Plata County Court Judge:

Your Affiant, Cindi Clay, certified police officer in the state of Colorado, employed by the Durango Police Department since April 2003.  Your affiant has reason to believe that probable cause exists that the crime of Check Fraud in violation of C.R.S §18-5-205 a Class 6 Felony, has been committed by Amanda Kershner, date of birth: 05/05/1969.

The grounds for such belief are as follows:
Durango Police Department incident numbers: #200533263, #200534035, #200533904, #200533766, #200533669, #200533602.

On 03/16/2004, Amanda Kershner began writing insufficient checks to Durango area merchants.  Kershner wrote eleven (11) insufficient checks between 03/16/2004 and 05/25/2005 for a total amount of $658.61.  The checks were drawn on Kershner's Bank of Colorado account #3418844670, which had been closed since 02/25/2004.  The Bank of Colorado provided me with Kershner's financial account records.  These crimes occurred in the City of Durango, County of La Plata, in the State of Colorado.

Kershner wrote the following insufficient checks:

| Check # | Date | Victim | Amount | Type |
|---|---|---|---|---|
| 1050 | 3/16/2004 | Mercy Gift Shop | 6.98 | NSF |
| 1078 | 1/29/2005 | K-Bob's | 92.57 | ACT. CLOSED |
| 1084 | 4/27/2005 | Randy's | 176.72 | ACT. CLOSED |
| 1090 | 4/29/2005 | Junction Creek Liquors | 49.08 | ACT. CLOSED |
| 1092 | 5/1/2005 | Serious Texas BBQ | 42.50 | ACT. CLOSED |
| 1103 | 5/4/2005 | Gaucho's | 115.00 | ACT. CLOSED |
| 1111 | 5/8/2005 | Serious Texas BBQ | 35.00 | ACT. CLOSED |
| 1112 | 5/8/2005 | Serious Texas BBQ | 30.00 | ACT. CLOSED |
| 1113 | 5/9/2005 | Junction Creek Liquors | 50.00 | ACT. CLOSED |
| 1117 | 5/17/2005 | Serious Texas BBQ | 27.00 | ACT. CLOSED |
| 1125 | 5/25/2005 | Junction Creek Liquors | 33.76 | ACT. CLOSED |
| | | **Total** | **658.61** | |

The above businesses provided me with Kershner's returned checks.  Colorado Driver's License #CO940872484 was written on the front of all of the checks.  Records revealed that this driver's license number is registered to Amanda Kershner.                        **D.A. RULE 16**

My investigation revealed that Kershner is no longer residing at the Fort Lewis College address listed on her checks.  Officer Brett Deming of the Fort Lewis College Police Department stated that Kershner is no long a student or an employee at the college and that he does not have any information on her current whereabouts.

On 06/28/05, Jane Foy of the La Plata County District Attorney's Office stated that she received a phone call from Kershner on 06/10/05 reference another case.  Kershner informed Foy that she would be moving back to Durango and residing at the Spanish Trails Motel.  On 06/28/05, I telephoned the Spanish Trails and was informed that Kershner was not residing there.  Kershner's whereabouts are unknown at this time.

Based on the aforementioned facts, this officer believes probable cause exists to request a warrant be issued for the arrest of Amanda Kershner, described as follows:  adult female, 5'06", 170 lbs, brown hair, brown eyes, DOB 05/05/1969, Social Security #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, in violation of C.R.S. 18-5-205, Check Fraud, a Class 6 Felony.

WHEREFORE, your affiant requests that an arrest warrant be issued for Amanda Kershner for the crime of Check Fraud, C.R.S. §18-5-205.

FURTHER your affiant sayeth naught.

_____
Affiant's Signature

SUBSCRIBED, SWORN TO AND SIGNED BEFORE ME THIS 30 day of June, 2005 in the County of La Plata, State of Colorado.

_____
Judge Martha Minot
La Plata County Court Judge

23

**FORT LEWIS COLLEGE**
**POLICE DEPARTMENT**
**DAILY LOG**

**DATE: August 20th, 2003**                     **OFFICER'S NAME: Deming**
**SHIFT: First**           **BEGIN SHIFT: 0700**           **END SHIFT: 1500**
**RELIEVED: Rejholec**                     **RELIEVED BY: Hamilton**

DUTIES AND CALLS BY TIME.

**Note:** On 8/19/03 at 15:56 I observed Amanda Kershner driving Temple Stephenson's vehicle once again. I didn't have time to get involved but she is revoked for an alcohol offense and will go to jail with a $10,000 bond if she is seen driving again.  She was on CR. 238 near the Golf Course.  I will not follow up on this incident.

0650
0712
0727

0729
0741

~0815
~0845
0933
0948
0954
**1007**

**1018**

1033
1155

1220

1244
1359
1422



5

19:15:14                                    Durango                      24                      Page #   1
                                                                                                Case #:  04CR209

Booking Report #:   20041123
Booking Date/Time:   05/21/04   10:35
Name:   STEPHENSON, DAVIS TEMPLE
DOB:   05/12/67
Addr:   3467 W 2ND AVE BSMT
Addr:   P.O. BOX 3721
City:   DURANGO, CO 81301
Phone:   970-247-1234

┌─ Physical Info ─┐                    ┌─ Other Info ─┐
Age:   37                               JEAN:   SO001672
Racer:   W                              FBI:   188626HA0
Sex:   M                                MID:
Ethnic:   N                             SID:
Height:   5'10"                         Mug #:   040427202355
Weight:   210                           SSN:   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
Hair:   BRO                             Imnlg#:
Eyes:   BRO                             Fingerprint:
Skin:   LGT                             OLN:   01-347-0245
Facial:   01                            OLN State:   CO

POB:   CA                              Religion:
School:
Grade:       Stat:          GED:     APS:
Dangerous:  0    Hate/Bias:
Gang:
Gang Monlker:
Scars / Tattoos:   SCAR RIGHT FOREARM
Employer     UNEMPLOYED

                                    Date        Time

Custody Officer      S344                        00:00    Billing Agency #   DIST    DISTRICT COURT
Arresting Officer    S293                                 Custody Agency #   CO    - LA PLATA COUNTY
Transport Officer                                         Housing Facility
Probation Officer                                         Arrest Location    1060 E 2ND AVE
Admitting Officer    S344  - GILLEN DANIEL                Offense Location   DURANGO, CO 81301
Fingerprint Officer  S327
Detain Auth Officer  S047  - HANNA, MARCIA N   05/21/04   10:35

Release Auth Officer                             00:00    Class:    SPECIAL MANAGE!
Release Officer                                  00:00    Points:      0
Release Type:               Release To:                   Reason:   WARRANT ARREST
Detainer 1:  Call Rita Warfield if released
         2:  or attempts to bond!

ACTIVE: Y    Work Release:   N    Community Service:   N    Interpreter:              Attorney:

Comments:

CHARGES/COURT INFORMATION

| IBR # | NCIC # | Violation | Statute | Disposition | Date | Bond Amt/Type | Warrant # | Sentence |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1500.00 S | 04CR209 | 04CR209 |
| 90Z | 5030 | Violation of Bail Bond Co | 18-8-212 |  |  | 25000.00 | 04CR95 | 04CR95 |
| 25D | 2531 | Forgery - First Degree | 18-5-102 |  |  | 0.00 N |  |  |
| 90Z | 5011 | Parole Violation |  | PAROLE HOLD |  | 500.00 |  |  |
| 13A | 1325 | Assault - Third Degree | 18-3-204 |  |  | 50000.00 | 05CR116 | 05CR116 |
| 13A | 1324 | Assault - Second Degree | 11 - 203 | NEW CHARGE | 02/22/05 | 10000.00 | 05CR120 | 05CR120 |
| 1324 |  | Assault - Second Degree | 18-3-203 | NEW CHARGE | 03/01/05 |  |  |  |

D.A. RULE 16
000114

30  2⁵

1    the Court on this issue.  This is a preliminary hearing,

2    it's not a suppression hearing, it's not a motion to

3    dismiss based on privilege or whatever.  I don't think

4    that's properly an issue in front of the Court.

5    Sustained.

6    BY MR. SCHOWALTER:

7        Q    Do you -- let's see.  Why did you ask for the

8    search warrant, can I just ask you that, why did you ask

9    for it?

10       A    Because I knew that he had -- I had good

11   information that he had some computer-generated items in

12   his jail cell.

13       Q    Did you know he was going to bond out?

14       A    Did I know he was going to bond out?

15       Q    Right.

16       A    No.

17       Q    Did you know his parole was going to be

18   released?

19       A    No.

20       Q    And so you get the warrant -- first you look

21   through his locker and there wasn't anything in his

22   locker?

23       A    That's where I saw the floppy disk.

24       Q    And then you picked that -- you retrieved the

25   floppy disk at that time?

26

**Bill Fritsche**

To:                    Justin.Fay@co.laplata.co.us
Subject:            People v. Stephenson  04 CR 95
Attachments:    2014-03-22 Letter to DDA Justin Fay.pdf

Justin,

   I have had yet another weekend consumed by this case.  I have long ago dealt with the fact that this case is costing me money rather than contributing to my income.  Be that as it may I will not sit back and let Rita Warfield act as if she is a victim in this case and lying opening not only to the district court, but also the county court.  So at this point I expect the stipulation to fail.  Looking at what is going on I do not think 1 ½ days will get it done.  I will ask for three days.  We may lose, but it won't matter because Stephenson would have been paroled by now had we not relied on getting this stipulation done.  But we will still do the hearing—all three days, maybe more.

   However, going the route of parole gives us no limitations on filing a lawsuit in federal court against Ms. Warfield.  I am recommending that he pursue that.  We also plan to attack the protection orders that were gained via perjury against an incapacitated defendant and based upon our pledge that we would not challenge them.  The orders are truly of no effect.  The pleadings are perjury, and I have enough materials in my file to prove that.  I find it outrageous that Warfield uses the stipulation to get an uncontested restraining order when no facts justified such a pleading and then seeks to deny Stephenson of his benefit.

   I've enjoyed working with you on a friendly basis, but it now appears that I was the fool for going that route in this case.

*Bill Fritsche*
*Attorney at Law*
*WILLIAM J. FRITSCHE P.C.*
*2601 So. Lemay Ave., Ste. 7-141*
*Fort Collins, Colorado 80525*
*(970) 282-6910*
*(970) 226-4454 (fax)*
*bfinss@aol.com*
*lawyerbill@wjfpc.com*

*"We, as criminal-defense lawyers, are forced to deal with some of the lowest people on earth, people who have no sense of right and wrong, people who will lie in court to get what they want, people who do not care who gets hurt in the process. It is our job, our sworn duty, as criminal-defense lawyers, to protect our clients, from those people."*
*Cynthia Roseberry, Federal Public Defender*

**CONFIDENTIALITY NOTICE:** The information contained in this ELECTRONIC MAIL transmission is confidential.  It may also be subject to the attorney-client privilege or be privileged work product or proprietary information.  This information is intended for the exclusive use of the addressee(s).  If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution (other than to the addressee(s)), copying, or taking of any action because of this information is strictly prohibited.  This e-mail (including any attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. " 2510-2521, is confidential, and is privileged.  This e-mail is solely for the use of the addressee(s) named above.  Receipt by anyone other than the individual recipient is NOT a waiver of attorney-client privilege.

*27*

# WILLIAM J. FRITSCHE, P.C.

*a professional corporation*

| | | |
|---|---|---|
| WILLIAM J. FRITSCHE<br>*Attorney at Law* | 2601 SOUTH LEMAY AVENUE, STE. 7-141<br>FORT COLLINS, COLORADO 80525<br>Email: *bfinss@aol.com* | (970) 282-6910<br>Fax (970) 226-4454 |

March 22, 2014

Mr. Justin Fay
Deputy District Attorney
LaPlata County District Attorney
1060 Main Ave.
Durango, Colorado 81301

*Re: People v. Stephenson 04 CR 95*

Dear Mr. Fay:

Davis Stephenson has been telling me for years how vicious Rita Warfield has been. I have taken that with a huge "grain of salt" until now. In my 30 plus years doing criminal defense I have never encountered such an unprofessional law enforcement officer.

We did not challenge Ms. Warfield's efforts to get a restraining order as that was part of our arrangement with you. However, it is clear that Ms. Warfield has gone to great lengths to round up all of the true victims in this case and do everything possible to stop this stipulation. I have reached the conclusion she will prevail because your office has done nothing to keep her from lying to the court. She is NOT a victim in this case. She has drafted a letter to the court claiming to be a victim, she has lied in her petition for protection order and committed perjury that is stunningly clear. If any of her allegations about finding materials in Mr. Stephenson's cell were true, there is no question that she—as filing detective—would have pressed those charges.

Mr. Stephenson is an incapacitated person, and as such I intend to go after that protection order, which never should have been entered. The court could clearly see that Mr. Stephenson was served inside the department of corrections. I've reached the conclusion that the law has become a tool for certain parties in LaPlata County.

Unless you can get some control over your lying officer, this is what I think will happen. One, I will set this for hearing and expand it to about three days. Two, Stephenson will parole out without any control by LaPlata County and regardless of court findings on his 35(c), which is most likely proceeding to hearing. Three, I am going to advise Mr. Stephenson to bring a 1983 civil rights lawsuit against Warfield in Denver Federal District Court. She reported him to the FBI as a terrorist in 2002 because (a) he belonged to the American Indian Movement and (b) had the gull to write articles about law enforcement

abuse of American Indians in this country. She has attempted to abuse the VRA for her personal vendetta.

I appreciate the fact that you have attempted to resolve this.  However, all that has happened is that Mr. Stephenson has compromised his rights. If you can't assure me that you will have some control over this officer (NOT A VICTIM) and help me preclude her from taking that approach with the court, then we are resigning from this stipulation and filing a motion to set this for a three-day hearing.  Please advise.  My guess is that Mr. Stephenson will be out on parole by the time this gets to hearing.  I'm not sure how we attend, however, as Ms. Warfield has Mr. Stephenson restrained from being within 100 yards of the Durango Police Department.

Sincerely yours,

WILLIAM J. FRITSCHE P.C.

William J. Fritsche

cc:  Davis Stephenson

28

# WILLIAM J. FRITSCHE, P.C.

*a professional corporation*

WILLIAM J. FRITSCHE
*Attorney at Law*

2601 SOUTH LEMAY AVENUE, STE. 7-141
FORT COLLINS, COLORADO 80525
Email: *bfinss@aol.com*

(970) 282-6910
Fax (970) 226-4454

March 22, 2014

Mr. Davis Stephenson #118218
Skyline Correctional Facility
P.O. Box 300
Canon City, Colorado 81215-0300

*Re: 35(c) Petition, LaPlata County 04 CR 95*

Dear Davis,

I am having a horrible day on this computer. The letter I spent a long time drafting to you got deleted, so now I am attempting to remember what I wrote.

First, I don't want you to telephone me anymore. I don't have the time to listen to you for 20 minutes a day, either in person or via voicemail. Just mail whatever to me, but don't inundate me with written materials.

Second, I will no longer email your mother. These just get turned around and sent to ADC whenever she doesn't understand what is going on.

Third, I am totally convinced what you have been telling me for years about Rita Warfield. Frankly I thought you were a bit paranoid. However, she is everything you claimed—and perhaps more. Her letter to the court is enclosed. The letter is outrageous. I wonder if she actually got emails from those other parties. The language is virtually identical. I emailed Amanda Kershner to see if she knows anything. I can't believe she is now claiming to be a victim. She was a co-conspirator and should have been charged along with you.

Davis, this 35(c) has blown up. Unless DDA Fay gets Warfield under control I do not think it is going to get past the court. So, this is what I recommend:

First, let's see what happens on the 10th. If Herringer denies the stipulation, then I'll tell him a day and a half was an understatement and ask for a three-day hearing. For some reason you have believed that doing a 35(c) was a cakewalk. I can assure you that it is not and the chances of winning all of this is virtually nil. Do not rely on winning this 35(c). Courts guard their convictions like jewels. Even if we win the DA can tie it up on appeal for three years.

Second, I don't know why you abandoned the parole in February.  Get back on that and get paroled.  Had you been granted parole in February we would have had more leverage than we do now.  Get it done.

Third, if Warfield blows out this stipulation with these lies, then you need to file a civil rights lawsuit against her in federal court in Denver. Her conduct is outrageous.

Enclosed is a letter I sent via email to Justin Fay.

Sincerely yours,

WILLIAM J. FRITSCHE P.C.

William J. Fritsche

Enc:  As stated

-2-

29

**Rae Dreves**
_____

**From:**      "Carolyn Blanchard" <hheron@aol.com>
**To:**        "Rae Dreves" <rldreves@bresnan.net>
**Sent:**      Wednesday, November 09, 2005 5:07 PM
**Subject:**   RE: the box

Rae, I was working on another case and took the time today after reading your email to look into 'the box'.  It looks like I am missing the following:  transcripts of the preliminary hearing (6/23/2004) and transcript of the motion hearing 6-12-2005.  And just to be safe is there a transcript of whatever Schowaliker testified to in Mr. S's 05CR116 case?  (I always find prosecutors want to use what defense attorneys say about their clients against the client in some way so it is my gut feeling this is important stuff.).

It appears my task is to challenge the constitutionality of the criminal libel statute under which Mr. S is charged and any *Franks* or *Shreck* (regarding the search) issues.  Do I have that correct?  From the judge's order of July 12, 2005 that's what he appears to have left open.

When I first spoke with Eric, he had mentioned there was some web site the police allege Mr. S. made that the police destroyed.  Do I have that right?  I see no motion regarding the destruction of evidence.  From my original conversation it sounded like we may need an expert to determine what was and was not on Mr. S's computers.

So, after all that has been said - if my only task is writing a motion to challenge the constitutionality of the criminal libel statute Mr. S is charged under my best guess for completion of that would be mid December - let's say the 14th to be safe.

From my first cursory review of the file it looks like all that I listed needs to be done and that would take us into January.

So, these are my thoughts.  Please clarify what you believe my task is.  Thanks.  Carolyn

-----Original Message-----
**From:** Rae Dreves [mailto:rldreves@bresnan.net]
**Sent:** Wednesday, November 09, 2005 12:28 PM
**To:** Carolyn Blanchard
**Subject:** Re: the box

Hi Carolyn!

Can you give me an estimate of time it is/will take you to get pre-trial motions together on the "stuff in the box" a/k/a/ "Stephenson 95?" Eric and I have a court appearance tomorrow morning on Stephenson, and that is one of the questions that the Court will want to know as we discuss pre-trial time lines.

As we may have discussed, I can help with the pre-trial motions. In fact, I enjoy doing that kind of thing.

Finally, I am in need of research (preferably online) resources. What/who do you use? What is the cost? etc.

I am at the "bresnan.net" e-mail address today as I am working at home.

Thanks!

Rae

11/9/2005

30

# BRIAN K. SCHOWALTER
## Attorney at Law
101 West 9th Street
Durango, CO 81301
Phone (970)259-9759
Fax (970)247-5284
E-mail BrianSchowalter@DurangoAttorneys.com

January 9, 2005

Sheriff Duke Schirard
La Plata County Sheriff's Office
742 Turner Drive
Durango, CO 81303

Re: Inmate Davis Stephenson

Dear Sheriff Schirard:

I am writing regarding my client Davis Stephenson who is an inmate at your jail.

Mr. Stephenson asserts that he is being mistreated at the jail, in violation of C.R.S. 16-3-401.  I am concerned there is merit to Mr. Stephenson's assertions.  I received a grievance report from Mr. Stephenson, where it is apparently acknowledged that his legal mail has been opened by mistake.  He also asserts that he has been placed in a 24 hour lock down status and denied hygiene products, without justification.

Mr. Stephenson must be treated in a humane manner.  Please ensure that Mr. Stephenson is treated appropriately.  Feel free to contact me regarding this matter.

Sincerely,

Brian Schowalter

cc: Davis Stephenson

# Opinion 31

The Independent

*Voice From The News Room*

Page 4 ~ February 21, 2003

## ■ Letter to the Editor
### Keep the computers clean

**To the Editor:**

I would like to express my concern over the technology unfoldness in the computer labs. I am an unclassified student, and needless to say, I have been here almost ten years. I began my endeavors here at a tender age and after my fourth year I remember we were slapped with over $500 increase in fees because the college deemed technological advance-

Library are despisable! I know I spent my two cents on that equipment and I hate to see such poor maintenance on them. The college stands for professional excellence and I am bewildered to the treatment of thousands of dollars of equipment. The equipment should be well taken care of, cleaned and wiped clean after of every day, because the amount of students utilizing this equipment

## One-night stands: Hopping into bed to get the booty

*MaryAnn Christiansen*
Columnist

Here is the scenario: you are at a party and you've been boozin' as well as talking to a certain someone. This someone is a friend of a friend, more of an acquaintance, one thing leads to another and the next thing you know, its 8:00 a.m. and that

Here is a golden little rule to help anyone out who is questioning whether or not to pick up the phone. If you cuddle, call; simple as that. If its just sex, and then you both flop over and fall asleep and there isn't any huggy-smugy, lovey-dovey crap than you're most likely in the free and clear. But if you go cuddling up all night, you best be calling. Don't promise a call if you have no inten-

seems pretty clear that you're only in it for the night not the long haul. You can easily see why you really don't have legs to stand on for getting all pissy about not creating a relationship or even getting a call back. If it appears to your 'partner for the moment' that you want of hook-up without knowing much about them, they can probably assume that you probably aren't

awfully impersonal, and truly an act they don't want their body to engage in. One-night stands leave them feeling empty and lonelier than before the sex. Some long for the sex to make them feel whole, which seldom, will rarely ever do.

Basically there are two types of people: those who choose to hook up with unplanned acquaintance, and those who highly frown upon it

TEMPLE DAVIS STEPHENSON 118218 SF 35E  ID:52473235  [P 1/1]

You have received a **jpay** letter, the fastest way to get mail          32

From : Ernestine Hayes, CustomerID: 171005
To (Inmate): TEMPLE DAVIS STEPHENSON, ID: 118218
Date : 3/29/2013 10:13:40 PM EST,   Letter ID: 52473235
Location : SF


March 29 from Bill Fritsche

Hi E,

   I would have emailed you earlier, but someone hacked my computer and all three email accounts were disabled. This was a problem because courts now notify us and sometimes send orders via email. I spent several days getting it back up. Between that and another large pile of Dave's file that I discovered I am somewhat behind the schedule I told you of when we last emailed. Looks like it might be Tuesday morning I get that out to Dave and I still want to get his input before filing. I have to have it in Durango by April 8 and I have the option of sending overnight mail so if he gets it sometimes next week we should still be okay.

Something else that came up. I spent a great deal of time reading the trial transcript. My impression is that Rae Dreves was going through the motions. There were an incredible number of instances where she just let witnesses testify to hearsay without objection and allowed the DA (particularly Osborne) to lead the witness. Osborne also had a habit of repeating the witness' answers within the next question. That is not allowed as it doubles the statements of the witness and lends credibility to them. She also pretty much did not cross examine any witness as far as I could see.

However, the transcripts I have ended January 20 and the trial went into the next week. I think I have read enough to get the pleading in  but I need to find the rest of it before any hearing. What I don't have is Warfield's testimony and any of the defense case. I know from a letter Dreves wrote that the jury told her that her cross examination of Warfield almost won the day but that Dave hurt himself on the stand. All I take from that is that she conducted a cross examination of Warfield (maybe) and that Dave did testify. I assume you did too since there are documents showing reimbursement for your travel.

My question in the meantime is this if you speak with Dave: Did Randall Monk testify?

- W~ lied re Davis  NA

- FBRPA violation

- Dreves: ineffective by appeals court, ARC

33

Editor-In-Chief
Joey Kirchmer

# LETTERS TO THE EDITOR

Images had to fund raise their 15 percent. Were they supposed to fund raise before their publishing deadline of March 1st? Or were they supposed to fund raise the 15 percent by the end of the trimester? The cont-

ed by us in any matter in which we see fit"

ASFLC also completely denied any attempt of compromise offered by members of Images and several supporters of Images magazine. Celest Woo, who is currently the faculty advisor for Images, offerred

## I'm comfortable with the word "cunt"

**To the editor:**

CUNT. I've heard this word more in the past two weeks than ever before in my entire life. On Thursday of last week I went to The Vagina Monologues, a great performance. At one point in the monologues the entire audience was chanting at the top of their lungs, "CUNT! CUNT! CUNT! CUNT!" Old woman were whispering, "cunt", young women were screaming "CUNT!". Men, men of all ages chanting away, 'CUNT!     CUNT!     CUNT!     CUNT!" The next day in class I was posed with a question that plagued my mind all weekend, "why reclaim the word?" This led to more questions, what does it mean to reclaim the word, and who "claimed" it before?

After pondering this for hours I came to one simple answer, why reclaim the word when I own it? I own the word CUNT. I own it in

every possible way, I have one, I've been called one, I've called people one. I use the word freely but better yet, I own the word CUNT. Why should I have to reclaim a part of my anatomy? CUNT sounds much better than vagina anyway. Vagina belongs to the medical world, it's right up there with pleasing words like ointment, salve and prescription creams. CUNT is sweet. A one syllable word that holds the power to unite and divide.

I own CUNT. If I say that I have to reclaim CUNT then that means that at some point I gave up the ownership rights of my CUNT to someone else. I didn't. I understand the method to "reclaim" a word that can be used derogatorily against you and turn it into something positive and powerful. Well I argue that my CUNT, your CUNT, the word CUNT is already powerful.

To "reclaim" CUNT depowers the mystic, alluring, all-knowing CUNT. It also sets me aside and apart from my CUNT, and this depowers, devalues, and disrespects me. I am not reclaiming CUNT. I've owned my CUNT forever, and I have never lost it. I refuse to reclaim something that I've claimed from the get go. I own CUNT! I am taking a stand and refusing to jump on the "reclaim" bandwagon. I urge all women to not reclaim CUNT because you own it. Some of you must already know this because you were chanting it in public on Thursday night, with your kids, your lovers, and your husbands. Don't reclaim yourself! You own CUNT! I own CUNT!

Enjoy your body,
**Jennifer Marie Pacic**

## TOM THE DANCING BUG



WITH THE RECENT ADDITION OF THE SNOWBOARDING AND CURLING EVENTS, THE OLYMPIC COMMITTEE STARTED AN ENCOURAGINGLY INCLUSIVE AND POPULI'ST TREND! WATCH FOR THESE **NEW OLYMPIC EVENTS** AT SALT LAKE CITY

**DOWNHILL SNOWPLOW**
THE UNITED STATES' BEST SHOT HERE IS DAVID PLATT OF NEWTOWNE, Va., WHO HAD ONE PARTICULARLY SPECTACULAR RUN DURING THE TRIALS, FALLING ONLY TWICE! THE KEY HERE IS HOW EARLY PLATT GETS TO THE RENTAL SHOP, INCREASING HIS CHANCES OF GETTING BOOTS THAT FIT.

**SNOW ANGEL MAKING**
LIKE FIGURE SKATING, THIS IS AN AESTHETICS-BASED EVENT WITH JUDGING ON OVERALL PRESENTATION THE U.S.A. TEAM HAS THE

## The Vagina Monologues inspiring

**To the editor:**

I am writing in support of The Feminist Voice for their production of The Vagina Monologues.

magnitude.

What makes The Vagina Monologues so viscerally engaging? What makes Shakespeare so

nonetheless exerts a huge power over us. This power is real. It will not be ignored and will not go away. It is no small wonder